IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-114

No. 5A21

Filed 24 September 2021

IN THE MATTER OF: T.M.B.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 17 September 2020 by Judge Monica Bousman in District Court, Wake County. This matter was calendared for argument in the Supreme Court on 19 August 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Mary Boyce Wells for petitioner-appellee Wake County Human Services.*

*Parker Poe Adams & Bernstein LLP, by Carlos E. Manzano, for appellee Guardian ad Litem.*

*Mercedes O. Chut for respondent-appellant mother.*

BARRINGER, Justice.

Respondent appeals from the trial court's 17 September 2020 order terminating her parental rights in her minor child T.M.B. (Thomas).[1] After careful review, we affirm the trial court's order terminating respondent's parental rights.

---

[1] A pseudonym is used in this opinion to protect the juvenile's identity and for ease of reading.

## I.     Factual and Procedural Background

In December 2006, respondent prematurely gave birth to Thomas who weighed only two pounds and four ounces. Respondent's drug screen came back positive for cocaine, and respondent admitted to using cocaine during her pregnancy. In April 2009, CPS received a report that respondent was homeless, Thomas had a black eye, and respondent and her boyfriend, C.H., were abusing drugs. In September 2012, Thomas reported that C.H. was violent and aggressive in the home. On 7 October 2015, Wake County Human Services (WCHS) filed a juvenile petition alleging that Thomas was a neglected juvenile. The petition outlined respondent's extensive history with Child Protective Services (CPS) that began on 7 March 2000 and included sixteen reports of neglect regarding respondent's other children.

Following a hearing on 3 November 2015, the trial court entered an order on 18 November 2015 adjudicating Thomas to be a neglected juvenile. In a separate disposition order entered on 8 January 2016, the trial court found that respondent signed an Out of Home Family Services Agreement (OHFSA) on 29 September 2015. The trial court ordered respondent to comply with the OHFSA and to have supervised visitation with Thomas as agreed upon by Thomas's father, who was given sole legal custody of Thomas.

On 6 September 2018, WCHS filed a petition alleging Thomas to be a neglected juvenile and obtained nonsecure custody of Thomas. WCHS alleged that on

3 July 2018, a report was received that Thomas was hospitalized for mental health treatment at Holly Hill Hospital after running away from home for fear of the corporal punishment his father and stepmother inflicted upon him. The petition also alleged that a Child and Family Evaluation (CFE) was completed, and the CFE provider found that Thomas was exhibiting symptoms in the clinical range for anxiety, depression, posttraumatic stress, dissociation, dissociation-overt, dissociation-fantasy, sexual concerns, and sexual preoccupation.

After the adjudication hearing on the petition for neglect on 1 November 2018, the trial court entered a consent order adjudicating Thomas to be a neglected juvenile. The trial court again ordered respondent to comply with the OHFSA and ordered WCHS to retain custody of Thomas.

Following a permanency-planning hearing on 28 January 2019, the trial court entered an order on 21 February 2019 finding that respondent had completed a substance abuse assessment in July 2018 for a case regarding one of her other children. Respondent's parental rights to two of her children were terminated in 2018. At the time, respondent was the biological mother of five children under the age of eighteen, none of whom were in her care. She had been incarcerated and charged with felony child abuse in March 2018, convicted of misdemeanor child abuse, and released in December 2018. The primary permanent plan for Thomas was set as reunification with a parent, with a secondary permanent plan of adoption.

¶ 7 Following another permanency-planning hearing on 22 July 2019, the trial court entered an order on 3 September 2019 finding that a WCHS social worker visited respondent's home on 15 May 2019, and the home was unsuitable for a child. Respondent shared the home with her mother and respondent's girlfriend. It was cluttered with no room for a child to sleep. The trial court ordered that the primary permanent plan remain reunification with a parent, with a secondary permanent plan of adoption.

¶ 8 On 28 January 2020, the trial court entered a permanency-planning order finding that respondent had made minimal progress in engaging in her case plan. Specifically, the trial court found that WCHS had not been able to contact respondent from July to October 2019, respondent had engaged in unpermitted contact with Thomas through Facebook in October 2019, respondent had picked Thomas up from school and taken him to her home on 29 October 2019, and respondent had arranged for Thomas to be picked up from school on 5 November 2019 by C.H., though the attempt was thwarted by a WCHS social worker who intervened. In addition, the trial court found that respondent was still living with her mother and respondent's girlfriend. Finally, the trial court found that respondent had attended her updated substance abuse assessment on 26 November 2019 and complied with two random drug screens, both of which were negative. However, the trial court noted that WCHS had not received proof of respondent's attendance at Alcoholics Anonymous/Narcotics

Anonymous meetings. After making these findings, the trial court changed the primary permanent plan to adoption, with a secondary permanent plan of reunification with a parent.

¶ 9        Around July 2020, Thomas was placed in a therapeutic foster home with prospective adoptive parents. Thomas bonded with his foster parents who fully incorporated him into their lives. Thomas stated that he would like to be adopted by his foster parents.

¶ 10        WCHS filed a motion to terminate respondent's parental rights to Thomas[2] pursuant to N.C.G.S. § 7B-1111(a)(1), (2), and (9) on 4 February 2020. Following a 20 August 2020 hearing on WCHS's motion to terminate respondent's parental rights, the trial court entered an order on 17 September 2020 concluding that grounds existed to terminate respondent's parental rights to Thomas pursuant to N.C.G.S. § 7B-1111(a)(1), (2), and (9). The trial court also concluded that it was in Thomas's best interests that respondent's parental rights be terminated and terminated respondent's parental rights. Respondent appealed.

## II.    Analysis

¶ 11        North Carolina law sets out a two-step process for the termination of parental rights: an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109 to -1110

---

[2] WCHS also filed to terminate the parental rights of Thomas's father, but the petition was heard separately, and he is not a party to this appeal.

(2019). At the adjudicatory stage, the petitioner bears the burden of proving by clear, cogent, and convincing evidence the existence of one or more grounds for termination under N.C.G.S. § 7B-1111(a). N.C.G.S. § 7B-1109(e)–(f). Then, if the trial court finds that one or more grounds for terminating the respondent's parental rights exist, the matter proceeds to the dispositional stage where the trial court examines whether termination of the respondent's parental rights is in the juvenile's best interests. N.C.G.S. § 7B-1110(a).

## A. Standard of Review

Respondent challenges numerous findings of fact from the adjudication stage, as well as the trial court's conclusions of law concerning each of the three grounds under N.C.G.S. § 7B-1111(a) which it found warranted termination. On appeal, this Court limits its review of the findings of fact to "only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *In re T.N.H.*, 372 N.C. 403, 407 (2019). We review these findings "to determine whether [they] are supported by clear, cogent and convincing evidence." *In re Montgomery*, 311 N.C. 101, 111 (1984). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379 (2019). Further, "[f]indings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re*

*T.N.H.*, 372 N.C. at 407. "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19 (2019).

**B. Termination Pursuant to N.C.G.S. § 7B-1111(a)(9)**

Respondent challenges the trial court's adjudication that termination was warranted pursuant to N.C.G.S. § 7B-1111(a)(9). Under N.C.G.S. § 7B-1111(a)(9), grounds exist to terminate a parent's parental rights when "[t]he parental rights of the parent with respect to another child of the parent have been terminated involuntarily by a court of competent jurisdiction and the parent lacks the ability or willingness to establish a safe home." N.C.G.S. § 7B-1111(a)(9) (2019). A "safe home" is defined by statute as one "in which the juvenile is not at substantial risk of physical or emotional abuse or neglect." N.C.G.S. § 7B-101(19).

**C. Challenges to Specific Findings of Fact**

On appeal, respondent challenges numerous factual findings made by the trial court. However, we address only those challenges that are necessary to support the trial court's adjudication that grounds existed to terminate respondent's parental rights pursuant to N.C.G.S. § 7B-1111(a)(9). While respondent challenges other findings of fact, those findings are clearly unnecessary to support the grounds for termination given the findings examined below, so we do not address them.

Respondent challenges findings of fact 17 and 18 stating that she had a history

of not complying with orders regarding contact with Thomas's brother Troy,[3] including "[a]lmost immediate[]" disregard of a 2017 supervised contact order. Respondent appears to question these findings' relevance, noting that they do not involve Thomas, and further contending that they were exaggerated. While respondent is correct that the findings do not involve Thomas, they are still relevant since they involve the previous termination of respondent's parental rights with respect to a child. Moreover, findings 17 and 18 were not exaggerated. As reflected in the testimony and exhibits admitted at the termination hearing, the trial court rendered an order prohibiting respondent from unsupervised contact with Troy in August 2017 and then rendered another order waiving further review in November of 2017. Only a month later, in December of 2017, respondent violated that order, engaging in unsupervised contact with Troy. This was in addition to numerous other violations of visitation orders. Accordingly, we conclude that findings of fact 17 and 18 were supported by clear, cogent, and convincing evidence.

¶ 16    Next, respondent challenges the trial court's findings that she lacked insight into Thomas's trauma. Respondent appears to interpret these findings as stating that she denied Thomas's abuse. But that is not what the trial court found. In its findings, the trial court noted that respondent had acknowledged to some degree that Thomas

---

[3] This Court previously used this pseudonym in its opinion reviewing and affirming the termination of respondent's parental rights to Troy. *In re T.N.H.*, 372 N.C. 403, 404, 412–13 (2019).

had been sexually abused but focused on her lack of insight into this abuse. As detailed below, respondent's own words and actions demonstrated that she did not understand the extent of Thomas's trauma or how to help him heal from it.

¶ 17     Prior to the termination hearing, respondent had asserted multiple times that she did not believe Thomas had ever been sexually abused, even when presented with evidence to the contrary. At the termination hearing itself, respondent stated she believed Thomas was sexually abused, but she did not appear to understand the extent of his trauma, downplaying it since he had not been "penetrated."

¶ 18     Additional evidence supported the trial court's finding that respondent had not gained insight into Thomas's trauma. Respondent contends that her testimony concerning her own abuse was sufficient to show that she understood Thomas's trauma. This testimony consisted of respondent disclosing her own experiences and asserting that, "[Y]ou can't tell me nothing that I already don't know." However, other testimony showed that this past experience had not provided respondent insight into how to prevent her children from being sexually abused or how to care for the trauma they incurred. Further, respondent limits her challenge on appeal to Thomas's sexual abuse. However, the trial court found that Thomas's trauma stemmed from both sexual abuse and the severe physical abuse he endured at the hands of his birth father and C.H. Respondent does not challenge that she lacked insight into Thomas's trauma resulting from physical abuse. Nor does respondent contend that she has

insight into the anxiety, depression, posttraumatic stress disorder, dissociation, dissociation-overt, dissociation-fantasy, sexual concerns, and sexual preoccupation Thomas endured as a result of both sexual and physical abuse.

¶ 19 Further, respondent's actions demonstrate a lack of insight into Thomas's abuse. In July of 2019, the trial court suspended respondent's visitations out of concern for Thomas's mental health. Nevertheless, respondent disregarded those concerns, putting her own needs above the safety and welfare of her son. Respondent engaged with Thomas on social media, visited with him, and attempted to arrange more visits, despite the threat they posed to Thomas's mental health. These actions contradict respondent's assertion that she understands the trauma Thomas experienced. Rather, the evidence of respondent's actions and her own testimony support the trial court's finding that respondent lacked insight into Thomas's trauma.

¶ 20 Next, respondent contends that the evidence does not support finding of fact 33 that she could not control Thomas while he was in her care, prevent him from spending time with a past abuser and other unsafe individuals, or stop him from engaging in risky behaviors. In support of this challenge, respondent proffers her testimony that she could prevent Thomas from visiting C.H. but not from calling him. However, other evidence presented at the termination hearing contradicts this assertion. In the two-and-a-half years preceding the termination hearing, respondent twice obtained custody of one of her children and each time exposed that child to an

abuser. First, in January 2018, respondent brought Troy to a motel and then left him unsupervised, directly leading to his sexual abuse. Second, in October 2019, respondent picked up Thomas and immediately brought him to meet C.H., a past abuser. The next month, respondent again would have placed Thomas in a dangerous situation, as respondent had arranged for C.H. to pick Thomas up from school until the plot was uncovered by a social worker. In addition, respondent conceded that she could not control Thomas's access to technology, and Thomas had demonstrated a proficiency for using communication technology. Based on the evidence before the trial court, we find that it could discredit respondent's assertion and find that if Thomas was returned to her care, she either could not or would not keep him away from dangerous individuals, control him, and prevent him from engaging in risky behavior. Accordingly, we are bound by the trial court's finding of fact 33.

¶ 21 Next, respondent challenges the portions of findings of fact 35–40 relating to her obtainment of mental health services. Specifically, respondent challenges the findings that her untreated mental health condition made it emotionally unsafe for her to interact with Thomas, that respondent did not engage in mental health treatment to resolve this issue, that respondent was not taking medication for her diagnoses, and that COVID-19 did not cause respondent's lack of progress.

¶ 22 Each of these findings, however, are supported by sufficient evidence. Respondent's psychological evaluation concluded that she needed to progress in her

personal stability before interacting with Thomas again, and her social worker testified that she never reached a place where she could safely participate in Thomas's mental health treatment. Additionally, the documentary and testamentary evidence reflected that respondent was neither taking medication for her mental health diagnoses, despite finding that it had helped her in the past, nor participating in any mental health counseling. Additionally, though respondent admitted that she needed mental health treatment to stabilize her mood, she had not participated in any appointments with Turning Point despite being directed to them for treatment. Respondent blames Turning Point and COVID-19 for her nonparticipation in mental health treatment, but the evidence demonstrates that respondent had a history of missing mental health appointments, even when they were scheduled for her in advance and she received numerous reminders.

¶ 23      Finally, respondent challenges the trial court's finding that she was unable to provide safe and stable housing for Thomas. Respondent's challenge mostly centers on the fact that she was looking for housing at the time of termination. However, respondent had only recently started looking for housing at the time of the termination hearing. Prior to that, respondent had been living with her mother in a home a social worker had reviewed and found not suitable for a child. The last time respondent brought Thomas to visit this home, in October of 2019, he was exposed to a past abuser. Further, at the time of the termination hearing, respondent was

residing in a motel. Given the foregoing, the trial court's finding that respondent had not obtained safe and stable housing for Thomas was supported by clear, cogent, and convincing evidence.

**D. Challenge to the trial court's legal conclusion**

¶ 24        Respondent further argues that the facts addressed above do not support the trial court's legal conclusion that grounds existed to terminate her parental rights pursuant to N.C.G.S. § 7B-1111(a)(9). We disagree. As an initial matter, we note that the first requirement of N.C.G.S. § 7B-1111(a)(9)—that the parental rights of the parent with respect to another child have been previously terminated—is met in this case and unchallenged. Respondent previously had her custody to Thomas's brother Troy terminated, which this Court affirmed. *See In re T.N.H.*, 372 N.C. at 412–13. Accordingly, respondent focuses her arguments on the second requirement of N.C.G.S. § 7B-1111(a)(9)—that respondent lacks the ability or willingness to establish a safe home. Respondent contends that she is able and willing to provide a safe home since she is no longer incarcerated, understands the sexual trauma Thomas endured, would not put Thomas at risk of abuse, no longer is in a relationship with one of Thomas's abusers, and sufficiently changed her circumstances.

¶ 25        However, respondent's contentions are contradicted by the trial court's previously described findings of fact to which this Court is bound. These findings show that at the time of the termination hearing respondent was unable to protect

Thomas from abuse or prevent him from engaging in risky behaviors. Indeed, respondent was still actively exposing Thomas to abusers. Additionally, respondent had not gained insight into Thomas's sexual- or physical-abuse-related trauma or how to properly care for it. Further, respondent had not procured a safe or stable home for Thomas to live in. Finally, respondent had failed to progress in her mental health treatment to a point where she could safely interact with Thomas without endangering his emotional safety. These findings, which were supported by clear, cogent, and convincing evidence, are sufficient to support the trial court's conclusion that respondent lacked the ability and willingness to provide Thomas a safe home.

## III.    Conclusion

Since only one of the grounds outlined in N.C.G.S. § 7B-1111(a) is necessary to support a termination of parental rights, we decline to address respondent's arguments challenging the trial court's finding that grounds existed to terminate her parental rights under N.C.G.S. § 7B-1111(a)(1) and (2). Respondent does not challenge the trial court's determination, in the dispositional stage, that it was in Thomas's best interests to terminate her parental rights. Accordingly, we affirm the trial court's order.

AFFIRMED.